UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| PREFERRED FINANCIAL | ) | |
| SOLUTIONS, INC., | ) | Case No. 1:12-cv-00649-DML-JMS |
| JEFFREY BROOKS, | ) | |
| CREDIT CARD RELIEF, INC., | ) | |
| THOMAS P. DAKICH doing business as | ) | |
| DAKICH & ASSOCIATES, | ) | |
| | ) | |
| Defendants. | ) | |

## Order on Cross-Motions for Summary Judgment

This lawsuit concerns Allstate Insurance Company's obligations to the

defendants with respect to a class action lawsuit filed in Georgia against the

defendants and others (the "Underlying Litigation"). Allstate has moved for

judgment as a matter of law that its insurance policies do not provide coverage for

the class action claims and that it therefore has no duty to provide a defense in the

Underlying Litigation and no duty to indemnify any of the defendants against any

judgment that may be entered against them. Allstate also argues that defendants

Credit Card Relief, Inc. and Thomas P. Dakich d/b/a Dakich & Associates are not

within the class of insureds under the policies. Three of the defendants have cross-

moved for summary judgment. Preferred Financial Solutions, Inc., Jeffrey Brooks,

and Credit Card Relief, Inc. argue that they are entitled to judgment that they are

insureds and that Allstate owes a duty to defend them.  They do not maintain, however, that the court can determine as a matter of law Allstate's indemnity obligations at this juncture.  Defendant Thomas P. Dakich d/b/a Dakich & Associates has not responded to Allstate's summary judgment motion or filed a cross-motion, even though he is represented by the same counsel who represents the other defendants.

## Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Substantive law determines the facts that are material.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986).  A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249.  The court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences from the evidence in favor of the nonmoving party.  *Zerante v. DeLuca,* 555 F.3d 582, 584 (7th Cir. 2009).  When evaluating cross-motions for summary judgment, therefore, the court construes the evidence and its reasonable inferences in favor of the party against which the particular motion under consideration is made.  *Metro Life Ins. Co. v. Johnson,* 297 F.3d 558, 561-62 (7th Cir. 2002).  "[I]f genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate."  *Olayan v. Holder,* 2011 WL 6300615 at *5 (S.D. Ind. Dec. 15, 2011).

## Preliminary Matters

### *The Policies at Issue*

Allstate issued yearly Business Insurance Policies to "Preferred Leads"[1] that were in effect from July 20, 2002 to July 20, 2012.  The first three annual policies (commencing July 20, 2002, July 20, 2003, and July 20, 2004) covered business premises in Indiana and Illinois.  Beginning July 20, 2005, separate policies were issued for the Indiana premises and the Illinois premises.

Allstate contends that because the Underlying Litigation concerns activities associated only with the Indiana premises, then only the three early policies that covered both Indiana and Illinois premises and the 2005 through 2012 Indiana Policies ("Indiana Business Policies") could possibly provide coverage.  Allstate argues it is thus entitled to summary judgment that there is no coverage, and no duty to defend or to indemnify, with respect to the separate Illinois Policies issued annually from July 20, 2005 through July 20, 2012 (the "Illinois Policies").  The defendants did not respond to Allstate's argument regarding the Illinois Policies and did not identify any factual disputes precluding judgment in Allstate's favor that there is no coverage under the Illinois Policies.  The court therefore enters a declaratory judgment in favor of Allstate and against all defendants that no coverage exists, and no duty to defend or to indemnify arises, under the Illinois Policies as to any defendants with respect to the Underlying Litigation.

---

[1]     The parties agree that this refers to defendant Preferred Financial Solutions, Inc.

The parties agree that the relevant language in all the Indiana Business Policies is materially identical.  The court's rulings thus apply identically for all the Indiana Business Policies.

### *Governing Law*

The parties also agree that Indiana substantive law governs coverage obligations and duties to defend arising from the Indiana Business Policies.  An insurance policy is a contract and its construction and interpretation is generally a question of law resolved by the same principles applicable to other contracts.  *Dunn v. Meridian Mut. Ins. Co.,* 836 N.E.2d 249, 251 (Ind. 2005); *Colonial Penn Ins. Co. v. Guzorek,* 690 N.E.2d 664, 667 (Ind. 1997).  The court's objective is to ascertain and enforce the parties' intent as manifested by the contract language.  *Cotton v. Auto-Owners Ins. Co.,* 937 N.E.2d 414, 416 (Ind. Ct. App. 2010).  If the contract language is ambiguous—meaning that the language is susceptible to more than interpretation and reasonably intelligent persons could honestly take different sides as to its meaning—then the court must construe that language against the insurer and in favor of its insured.  *E.g., State Farm Mut. Ins. Co. v. D'Angelo,* 875 N.E.2d 789, 796 (Ind. Ct. App. 2007).

The Indiana Business Policies require Allstate to defend any lawsuit "brought against persons insured seeking damages to which [the comprehensive liability insurance] applies even if the allegations in the suit are groundless, false or fraudulent." (*See* Exemplar Policy, Dkt. 1-2 at p. 38).  If the claims against the defendants in the Underlying Litigation potentially fall within indemnity coverage

provided by the Policies, then Allstate's duty to defend is triggered. *Newman Mfg., Inc. v. Transcontinental Ins. Co.,* 871 N.E.2d 396, 401-02 (Ind. Ct. App. 2007) (a duty to defend arises when there is the possibility of indemnity coverage under the policy). On the other hand, if it is clear that the claims against the insured are "patently outside the risks" for which coverage is afforded by the Policies, then Allstate has no duty to defend the claims or, of course, to indemnify its insureds in the event that the claims are decided against them. *Id. See also West Bend Mut. Ins. Co. v. U.S. Fidelity and Guaranty Co.,* 598 F.3d 918, 922 (7th Cir. 2010) (applying Indiana law) (where claim is patently outside the risks covered by the policy, the insurer has no duty to defend).

The court now turns to the parties' disputes regarding Allstate's coverage obligations. We first describe the Underlying Litigation. We then address who is an insured under the Indiana Business Policies. Finally, we consider whether the claims in the Underlying Litigation could possibly fall within Allstate's coverage obligations and thus trigger Allstate's duty to defend.

## The Underlying Litigation

The Underlying Litigation is a putative class action filed in the Middle District of Georgia (Case No. 5:11-cv-00422) by Tina M. Gregory and Eddie James Wells against the defendants in this case (Preferred Financial Solutions, Credit Card Relief, Thomas P. Dakich d/b/a Dakich & Associates, Jeffrey Brooks) and seven other individuals. The operative complaint is a Third Amended Complaint

("TAC") for Damages in Class Action, filed August 13, 2013, as docket no. 77 in the Underlying Litigation.[2]

The plaintiffs are a class of Georgia residents who purchased "debt adjusting" services. They claim that the defendants "conspired together to comprise a debt adjustment services operation targeting financially-troubled consumers [and] extracting exorbitant fees for worthless services from individuals least able to afford it." (TAC, ¶ 2). They assert that the defendants are jointly and severally liable to the plaintiffs either as conspirators, joint venturers, as alter egos of each other, aiders and abettors, or under a piercing the corporate veil theory. (TAC, ¶¶ 3, 4, 5, 6).

The complaint in the Underlying Litigation describes the roles of the defendants as follows: Preferred Financial Solutions ("PFS") and Credit Card Relief are the entities with which and through which the individual defendants participated in the debt adjustment services advertised and sold to Georgia residents. Thomas P. Dakich and Jeff Whitehead are attorneys who acted as PFS's "national mediation counsel" and communicated with Georgia debtors and their creditors. Rhoda Roell-Taylor and Laquetta Pearson are attorneys licensed to practice law in Georgia who ostensibly acted as attorneys for Georgia debtors who contracted for the debt services. Jeffrey Brooks, Larry D. Wilson, Steve Mylinski,

---

[2]     During briefing of the cross-motions for summary judgment, the plaintiffs in the Underlying Litigation were granted leave to file a Third Amended Complaint. The parties' briefing addressed the allegations of the Third Amended Complaint and their effect on the coverage disputes. The court takes judicial notice of the contents of the Third Amended Complaint.

Daniel Yuska, and Rod Miller are principals or employees of PFS who participated in the creation, marketing, or operations of the debt service business.

The roles of PFS and Credit Card Relief are also described in an affidavit by Jeffrey Brooks submitted in support of the defendants' motion for summary judgment. (Dkt. 39-1). According to the affidavit, Mr. Brooks is the president of both PFS and Credit Card Relief. Credit Card Relief's business is marketing the services of attorneys to negotiate debt relief for consumers. PFS is the "back-office service provider" to law firms that negotiate debt relief. Together and "as joint venturers," PFS and Credit Card Relief ran a "marketing operation to advertise and promote the services of attorneys who negotiate and settle consumers' credit card debt." (Dkt. 39-1, ¶ 5).

Debt adjustment services are regulated by a Georgia statute, the Georgia Debt Adjustment Act, OCGA 18-5-1 *et seq.* Among other requirements, the Georgia Act limits the maximum fees that may be charged by a debt adjuster, requires each debtor's funds to be maintained in a separate trust account, and requires the disbursement of a debtor's funds (less authorized fees) within 30 days of their receipt. The Act excludes from its purview "those situations involving debt adjusting incurred in the practice of law in this state." OCGA 18-5-3.

According to the TAC in the Underlying Litigation, the defendants offered a Debt Settlement Plan and a client selected credit card debts to "enroll" in the Plan. A total monthly payment was then determined and the client was responsible for paying this amount to a trust controlled by one or more of the defendants for the

benefit of the client's creditors. The client then would stop making payments directly to her creditors, and an attorney affiliated with the defendants (but whom the client purportedly retained separately) would use "technology and negotiating skills" to settle the debts at a steep discount from the amount the client owed when she enrolled the debts in the Plan. The client agreed to the following fees: (a) a 7% enrollment fee measured on the total debt the client enrolled in the Plan, (b) a $49.95 monthly maintenance fee, (c) a 25% settlement fee measured on the amount "saved" on a debt, and (d) a $120.00 Local Participating Program Attorney fee. The Program Attorney fee ostensibly paid for the services of a Georgia-licensed attorney to prepare an attorney engagement letter, review the client's enrollment forms, and conduct an "initial telephone consultation" with the client.

The class plaintiffs contend that they enrolled debts in the Plan and made monthly payments as directed, and the defendants collected the enrollment fee, monthly maintenance fee, and attorney fee, but that none of the plaintiffs' debts were ever settled. Plaintiff Gregory—whose experience is alleged to be typical of the putative class members—never spoke to anyone who purported to be her Plan lawyer. She enrolled $26,210 of debt in the Plan, paid the $120 attorney fee, and made $250 bi-monthly electronic funds transfers to the Plan for six months, from February 2008 through July 2008. Ms. Gregory cancelled her enrollment in July 2008, by which time no payments had been made to her creditors, none of her debts had settled, and no attempts were ever made to settle her debts. At cancellation, the defendants sent Ms. Gregory a check for $849.59 and claimed that

the remaining funds she had paid to the trust were earned by the defendants as their enrollment fee ($1,830.76), monthly maintenance fees ($49.95 for six months, or a total of $299.70), and attorney fee ($120).

Plaintiff Gregory and the putative class contend that the defendants' conduct (a) violated the Georgia Act; (b) was grounded in fraudulent representations regarding their debt services; (c) was grounded in negligent representations or "unintentional false representations" regarding their debt services; and (d) was in breach of fiduciary duties to the plaintiff clients.

<u>Analysis of Coverage Obligations</u>

The parties' cross-motions for summary judgment raise three main interpretative issues, which the court addresses in order below. The first issue is whether Credit Card Relief, Inc. and Thomas P. Dakich are insureds. The second issue is whether the claims against the insureds in the Underlying Litigation potentially fall within the "accidental event" or "advertising injury" coverages under the Indiana Business Policies. The third issue is whether, even if there is potential accidental event or advertising injury coverage, any exclusions in the Policies apply.

**I. Who is an insured**

The court first addresses whether Credit Card Relief, Inc. and Thomas P. Dakich d/b/a Dakich & Associates are insureds under the commercial general liability (CGL) Part of the Indiana Business Policies. The parties agree that defendants PFS and Jeffrey Brooks are insureds. The CGL Part, which extends coverage for an "accidental event" or "advertising injury"—the only two sources of

9

coverage that the defendants allege—defines the class of insureds by reference to classifications on the Declarations page of the Indiana Business Policies.  The relevant provision states:

"The following people and organizations are persons insured under this [comprehensive liability] Part [of the policy]:

1. If you are shown in the Declarations as an Individual, you and your spouse for activities related to your business.
2. If you are shown in the Declarations as a partnership or joint venture: The partners and joint venturers as long as their liability arises out of their activities as a partner or joint venture.  We will also cover the spouse of any partner or joint venture for activities related to your business.
3. If you are shown in the Declarations as any organization other than an individual, partnership or joint venture:  Executive officers, stockholders, members of the board of trustees, and directors or governors while they are acting within the course and scope of their duties.
4. Your employees while acting within the course and scope of their employment.
5. Any person or organization acting as your real estate manager.
6. Any organization you acquire or form during the policy period and in which you have at least a majority interest, except for joint ventures. We will not provide coverage for that organization if it is covered under any other policy, even if you cannot collect because you have exhausted policy's limits of liability.  Coverage for an organization you acquire or form will end 90 days after you acquire or form it, unless specifically added to the policy by endorsement.
   . . . . .

(the "Persons Insured" provision).

Paragraph 1 on the Declarations page identifies "The Insured" as "Preferred Leads, Preferred," with a mailing address of 5656 W. 74th Street, Indianapolis, IN.  (Dkt. 1-2 at p. 3).  The parties agree that this reference is to defendant Preferred Financial Solutions, Inc.  The Declarations page classifies PFS as a corporation, and states: "The Insured is a CORPORATION."  (Dkt. 1-2 at p. 3).  The plain language of paragraph 3 of the Persons Insured provision applies because a corporation is "any

organization" that is not an individual, partnership, or joint venture.  When the insured is the type of entity described in paragraph 3, then the class of insureds is made up of "Executive officers, stockholders, members of the board of trustees, and directors or governors while they are acting within the course and scope of their duties."  Mr. Brooks, the parties agree, is also an insured because he is the president of PFS and is being sued in the Underlying Litigation for actions taken in that capacity.  *See* paragraph 3.  Mr. Dakich and Credit Card Relief, Inc. do not contend that they fall into any of these categories" [3]

PFS and Credit Card Relief assert, however, that under paragraph 2 of the Insured Persons provision, the class of insureds also encompasses those identified by reference to PFS's status as a "joint venture."  Based on Mr. Brooks's affidavit and the allegations in the Underlying Litigation, PFS states that it is a joint venture, and not just a corporation.  It further states that the joint venture includes Credit Card Relief, Inc., thus making Credit Card Relief an insured under the language of paragraph 2.  Paragraph 2's coverage for a joint venture is limited to those instances, however, where the insured is "*shown* in the Declarations *as* a . . . joint venture."  (Emphasis added.)  As noted above, PFS is *shown* on the Declarations *as* a "corporation."  PFS counters that it is both a corporation and a

---

[3]      Paragraphs 4 (employees), 5 (real estate manager), and 6 (newly acquired or formed organizations) of the Persons Insured provision augment the classes of insured as well.  These paragraphs contain no language limiting their applicability across the four types of insureds described in paragraphs 1, 2, and 3:  (a) individual, (b) partnership, (c) joint venture, and (d) any organization that is not an individual, partnership, or joint venture.   No argument has been made that Mr. Dakich or Credit Card Relief, Inc. is afforded coverage by virtue of paragraphs 4, 5, or 6.

joint venture, and the Declarations' showing of PFS as a corporation should not be read to eliminate coverage with respect to PFS's status as a joint venture. The court disagrees. Even if it were possible for PFS to be both a corporation and a joint venture with one or more other entities (and the court will accept for purposes of coverage analysis that PFS is both a corporation and a joint venturer with Credit Card Relief),[4] the Declarations page does not *show* PFS as anything except a corporation. The Persons Insured provision of the Policies specifically references how an insured is "shown" on the Declarations page, and thus the court must define the insured by reference to the type of entity it is "shown" to be on that page. PFS is not shown as a joint venture, and thus neither it nor its alleged joint venturers may claim coverage by virtue of paragraph 2.[5]

---

[4] PFS and Credit Card Relief cite *Abbott Laboratories v. Takeda Pharmaceutical Co., Ltd.,* 476 F.3d 421 (7th Cir. 2007), for the proposition that a business entity can be a corporation and a joint venture at the same time. Though inapposite to the coverage issue in this case, *Abbott* does not in fact stand for that proposition. *Abbott* was a dispute between companies that had formed a joint venture, but later converted the joint venture into a corporation in which they had equal share ownership. The parties' status as "joint venturers" as opposed to "equal shareholders" was immaterial to the issues before the court, which involved interpretation of a contractual forum selection clause.

[5] The Indiana Business Policies classify the insured for a reason, the most obvious being that entity type affects perceived risk and premium. The language of paragraph 6 of the Persons Insured provision reinforces the importance of the insurer's knowledge of the type of organization it is insuring. It extends coverage for a limited period of 90 days to organizations that an insured acquires or forms during the policy period. That limited coverage specifically excludes a newly-acquired or newly-formed joint venture. The General Conditions section of the Policies also makes clear that the nature of the insured's business or its operations is material to the setting of premiums. It provides, in part, "we may require additional premiums if any of the following happens: There is a change in the nature of your business or in your operations or we learn of an additional risk related to your business." *See* Dkt. 1-2, at p. 51.

PFS bought a policy that covered it as a corporation only, and because Credit Card Relief fits none of the categories of insureds stemming from PFS's status as a corporation, the court finds as a matter of law that Credit Card Relief is not an insured to which Allstate owes a duty to defend or duty to indemnify under the Indiana Business Policies. And although the Underlying Litigation alleges that attorney Dakich served in some sort of executive capacity for PFS, the defendants do not contend that he is an insured. The court therefore finds that Mr. Dakich also is not an insured to whom Allstate owes a duty to defend or duty to indemnify under the Indiana Business Policies. *See* Allstate's Brief in Support of Motion for Summary Judgment, Dkt. 35, at pp. 13-14 (citing a lack of evidence that Mr. Dakich is an "employee, officer, stockholder, or board member of PFS").

To summarize, defendants PFS and Jeffrey Brooks are insureds under the Indiana Business Policies. Defendants Credit Card Relief, Inc. and Thomas Dakich are not. The court will now turn to the coverage obligations to PFS and Mr. Brooks.

## II. Coverage for "Personal Injury," "Accidental Event," and "Advertising Injury"

The commercial general liability portion of the Indiana Business Policies provides that Allstate "will pay on behalf of persons insured all sums which they become legally obligated to pay as damages arising out of an accidental event, personal injury or advertising injury that occurs while this policy is in effect. (Dkt. 1-2 at p. 37).

PFS and Mr. Brooks contend that the claims in the Underlying Litigation trigger potential coverage under the "accidental event" and "advertising injury"

provisions of the insurance contracts. They do not contest Allstate's showing that the "personal injury" provision of the Indiana Business Policies does not afford coverage. We find, therefore, that Allstate is entitled to judgment as a matter of law that the claims in the Underlying Litigation are clearly outside the "personal injury" coverage of the policy. *See, e.g.,* Defendants' Reply in Support of Cross-Motion for Summary Judgment, Dkt. 46, at p. 5. We limit our analysis to the parties' disputes regarding accidental event and advertising injury coverage.

## A. Accidental Event

Accidental event is defined in the Indiana Business Policies as "an accident, including continuous or repeated exposure to the same conditions, resulting in bodily injury or property damage. An accident cannot be intended or expected by any persons insured, except for use of reasonable force to protect persons or property."

Two issues arise in evaluating coverage under this provision: (1) whether the Underlying Litigation involves an "accident" not "intended or expected by any persons insured" and (2) whether, even if the Underlying Litigation alleges an accident not intended or expected by any persons insured, the accident "resulted" in bodily injury or property damage.

### 1. "Accident"

Allstate argues that the Underlying Litigation is not based on any "accident" or "unforeseen" occurrence. The class plaintiffs allege injury from the defendants' promotion and operation of a debt-relief program in a manner inconsistent with

representations and promises made to the plaintiffs, either because of fraud or negligence,[6] and in violation of the defendants' fiduciary duties to the plaintiffs and Georgia law. In other words, as described in the TAC, the claims against the defendants are based on their inducement of the plaintiffs to enter into business contracts for the reduction of the plaintiffs' debts and on their failure to perform—because of either negligence or fraudulent design—as promised.

PFS and Mr. Brooks contend that the Underlying Litigation involves an "accident" within the meaning of the Policies because the defendants' failures to provide what they promised (settlement of the plaintiffs' debts) "were not intended and, rather, were the unforeseen result of Defendants' efforts to enroll clients into the program." (Dkt. 39-1, ¶ 8). They argue that under Indiana insurance law principles, an "accident" occurs whenever a person is charged with negligence or when a person's conduct, though intentional, has "accidental consequences" that he did not intend. Dkt. 46 at p. 6.

The court's resolution of this issue is guided by two recent decisions of the Indiana Supreme Court.[7] They are *Tri-Etch, Inc. v. Cincinnati Ins. Co.,* 909 N.E.2d 997 (Ind. 2009), and *Auto-Owners Ins. Co. v. Harvey,* 842 N.E.2d 1279 (Ind. 2006).

---

[6] In the TAC, the plaintiffs allege that even if the defendants' representations regarding their program were not deliberately false, they were "negligently" or "unintentionally" false and induced the plaintiffs to pay for debt relief services they never actually received.

[7] When a state's substantive law applies to claims, the court must apply the state's laws "as the state's highest court would." *Bogie v. Rosenberg,* 705 F.3d 603, 609 (7th Cir. 2013).

Allstate stresses the principles addressed in *Tri-Etch,* while the defendants argue that *Auto-Owners* is analogous and supports their coverage contentions.

In *Auto-Owners,* a woman lost her balance, fell off the edge of a boat ramp, slipped down a rocky embankment, and landed in the river where she drowned. This series of events was triggered when her boyfriend pushed her, although he never expected that she would lose her balance or fall down the embankment or land in the river or drown. The subject liability policy covered all sums an insured "becomes legally obligated to pay as damages because of or arising out of bodily injury . . . caused by an occurrence." *Id.* at 1282-83. "Occurrence" was defined as an "accident," *id.* at 1283, and an accident was construed by the court to mean at the very least something that happens without intention. *Id.* ("We agree with Auto-Owners that implicit in the meaning of 'accident' is the lack of intentionality.")

The Supreme Court determined that under the facts alleged in the underlying suit by the woman's family against the boyfriend, "occurrence" was an ambiguous term. The court found that "occurrence" could mean the boyfriend's push *or* the woman's drowning, and the policy language did not require defining "occurrence" or "accident" solely based on the actions of the insured boyfriend. *Id.* at 1284. If the bodily injury—the woman's death—were considered to have been caused by the boyfriend's pushing, then there was no "accident" because his push did not occur "unexpectedly or unintentionally." *Id.* But if the bodily injury were framed by the woman's actions—her slipping, then falling, then drowning—then it could be deemed to have occurred unexpectedly and unintentionally, and thus was

an accidental "occurrence." *Id.* The court concluded that "we thus find the policy language ambiguous and must construe it against Auto-Owners, holding that the term 'occurrence' applies to [the woman's] slip, fall and drowning, and not to [the boyfriend's] push." *Id.* at 1285.

*Auto-Owners* does not hold, as PFS and Mr. Brooks urge, that actions that have unintended consequences from the insured's standpoint are "accidents" within the meaning of insurance policies that use the term. Their argument is grounded in the court's discussion of an exclusion in the *Auto-Owners* policy that eliminated coverage (even if there had been an occurrence from an accident) for any injury that was intentional or reasonably expected by the insured. Exclusions in insurance policies are narrowly construed (*see American States Ins. Co. v. Kiger,* 662 N.E.2d 945, 949 (Ind. 1996)), and the court ruled that there was a question of fact whether the boyfriend intended to harm his girlfriend. *Auto-Owners,* 842 N.E.2d at 1289-90. The court emphasized that the boyfriend testified that he had not intended to harm his girlfriend and had not intended or expected that she would fall into the water or suffer physical injury at all, and found that the evidence on summary judgment was "not so overwhelming as to mandate us to conclude that [the boyfriend] intended to harm [the woman]," for purposes of applying the exclusion. *Id.* at 1291.

The court was careful to note that its interpretation of the policy exclusion raised a question separate from its interpretation of the general indemnity language of the policy. Essential to the court's interpretation of the indemnity language was that the policy provided coverage where bodily injury was caused by

an "occurrence," defined as an accident, and that the occurrence/accident language was not limited to the actions of the insured. *Id.* at 1284-85. The meaning of the exclusionary language was a different issue altogether, and the court's discussion of the exclusion for injuries the insured reasonably expects or intends is not germane to construing the term accident within the indemnity language of a policy. *See id.* at 1288 (emphasis in original) ("In contrast to the insurance policy's insuring agreement that requires the *occurrence* to be accidental, [the] exclusion more narrowly considers whether the resulting *injury or damage* was intentional or reasonably expected by the insured.")

*Auto-Owners* does not hold, as the defendants argue, that an event or series of events is an "accident" whenever the insured does not intend his actions to cause harm.

In *Tri-Etch, Inc. v. Cincinnati Ins. Co.,* 909 N.E.2d 997 (Ind. 2009), the Indiana Supreme Court construed the term "occurrence," defined as an "accident" in the insurance policy, and applied it to a claim of injury arising from a business's negligence in the performance of its services. The defendant, Tri-Etch, provided alarm security services to a liquor store business. Those services included monitoring to ensure that the store's night alarm had been set after the store closed at midnight. One night Tri-Etch waited until 3:00 a.m. (instead of no later than 12:30 a.m.) to notify the store's owner that the alarm had not been set at midnight. The owner went to the store; his employee who had worked the closing shift and the store's money were missing. The employee was found at 6:00 a.m., beaten and tied

to a tree in a local park, though still alive.  He died later that day from his injuries, and his family sued Tri-Etch, claiming that if Tri-Etch had properly monitored the setting of the alarm and promptly notified the owner by 12:30 a.m. that the alarm had not been set, the employee could have survived his injuries.  Tri-Etch sought coverage under the provision of its commercial general liability policy for bodily injury caused by an "occurrence," which was defined as an "accident."  *Id.* at 1001.

Tri-Etch argued that there was no intentional wrongdoing on its part—that its failure to make the 12:30 a.m. call was an "unintentional oversight"—and that it, of course, did not intend any harm to result from that conduct.  The Indiana Court of Appeals had agreed with Tri-Etch that the claim against Tri-Etch was an "occurrence" because it was the result of unintentional conduct.  *See id.* at 1001. The Supreme Court reversed.

The court ruled that "[l]ack of intentional wrongdoing does not convert every business error into an accident."  *Id.* at 1001.  Instead, a business's failure to perform its services in the manner that it had promised is an "error or omission" but not by any stretch an "accident."  *Id.*  The court emphasized that a commercial general liability policy does not guarantee the quality of services (or products) provided.  *Id.*  In this vein, the court cited several decisions holding that businesses' failures to deliver the quality of services they had promised are not accidental occurrences under CGL policies.  *See id.* at 1002, citing *Transamerica Ins. Servs. v. Kopko,* 570 N.E.2d 1283, 1284-85 (Ind. 1991) (claim against home builder for property damage because of settled soil did not arise from an "accident"); *Erie Ins.*

*Co. v. American Painting Co.,* 678 N.E.2d 844 (Ind. Ct. App. 1997) (no coverage for property damage alleged to have arisen from negligent hiring and retention of employee); *Terre Haute First Nat'l Bank v. Pacific Employers Ins. Co.,* 634 N.E.2d 1336, 1338 (Ind. Ct. App. 1993) (bank's negligent administration of a guardianship was a "professional relationship," not an "accident").

The plaintiff estate protested that its claim was different from an "errors or omissions"-type defalcation claim. The estate emphasized that it had not sued based on a contractual relationship with Tri-Etch and was not claiming that Tri-Etch failed to live up to a contractual obligation to it, but was pursuing a tort theory that Tri-Etch's negligence had led to unintended injuries. The Supreme Court found that distinction made no difference; the essential point was that the claim was based on Tri-Etch's simple failure to do its job as promised, a risk that's involved in every business relationship, but which is not an accident covered under a general liability insurance policy. The court quoted approvingly from *Couch on Insurance*:

> It is important to note . . . that there is a difference between risks that arise out of a business and business risks. While the former may be covered under a commercial general liability insurance policy, the latter is not. Business risk occurs as a consequence of the insured not performing well and is a component of every business relationship that is necessarily borne by the insured in order to satisfy its customers.

*Id.* at 1003 (quoting 9A *Couch on Insurance* § 129:1 (3d ed. 2005)).

The court finds that the claims in the Underlying Litigation against Allstate's insureds are akin to the claims in *Tri-Etch.* The plaintiffs' injuries arise from the defendants' failure (whether negligent or not) to deliver debt-reduction services in

the manner promised or as otherwise required by Georgia law. Those are business errors or omissions, not an "accidental event" covered by the CGL policies.[8]

## 2. "Resulting in Bodily Injury or Property Damage"

The conclusion that the claims in the Underlying Litigation do not trigger "accidental event" coverage is bolstered by the corresponding conclusion that the Underlying Litigation does not allege resulting "bodily injury" or "property damage." As noted previously, "accidental event" coverage is limited to an accident "resulting in bodily injury or property damage." No one suggests that the Underlying Litigation includes claims for bodily injury. Allstate argues that the Underlying Litigation does not seek relief for "property damage" either, which is defined in the policies as "physical damage to, or the destruction of tangible property. . . " (Dkt. 11-3, pp. 57, 59). The Underlying Litigation seeks economic loss damages and does not assert claims that any tangible property was destroyed or physically damaged because of the defendants' failure to provide the debt reduction services they had promised the class plaintiffs.

---

[8] The court of appeals' opinion in *Indiana Farmers Mut. Ins. Co. v. North Vernon Drop Forge, Inc.,* 917 N.E.2d 1258 (Ind. Ct. App. 2009), *trans. denied,* does not water down *Tri-Etch.* In ruling that the insured's delivery of contaminated fill-dirt could be deemed an "occurrence" (which was defined as an "accident"), the *North Vernon* court recognized that the Supreme Court "recently explained that the term 'occurrence' does not contemplate . . . poor business performance. . . ." *Id.* at 1272 (citing *Tri-Etch*). The court of appeals decided that because the insured was not in the fill-dirt business and had made a "gift" of the dirt, then "[i]n short," it was "not a case of poor business performance, professional error, or breach of contract." *Id.* In this case, the Underlying Litigation alleges that the defendants were in the business of promoting and selling debt-reduction services but failed to deliver those services as promised. The Underlying Litigation alleges poor business performance (as well as allegations of fraudulent business performance).

The defendants' opposing argument is relegated to a footnote. (Dkt. 46 at p. 5 n.4). They cite cases—outside the insurance coverage context—for the principle that "money" can qualify as "tangible property." These cases concern money in the form of tangible currency—dollar bills or coins or even bank notes. *See, e.g., Levin v. Dare,* 203 B.R. 137 (S.D. Ind. Bankr. 1996) ("pieces of paper" used as United States currency are tangible personal property for purposes of applying Indiana's debtor exemptions); *Beery v. Los Angeles County,* 253 P.2d 1005 (Cal. App. 1953) (characterizing reserve notes and national bank notes physically located in a safe deposit box as tangible property under tax law); *Blodgett v. Silberman,* 277 U.S. 1, 18, 48 S.Ct. 410, 417 (1928) (coins and bank notes sitting in a deposit box classified as tangible property taxable based on its situs in the state where the deposit box is located).

The court agrees with Allstate that the Underlying Litigation does not claim "property damage" as defined by the policies. The injured debtors seek to recover for economic losses they suffered because of the defendants' conduct; they do not claim that tangible pieces of paper currency were destroyed or physically damaged. For this reason too, therefore, the court determines that Allstate is entitled to judgment that the claims in the Underlying Litigation do not potentially trigger "accidental event" coverage in the Indiana Business Policies.

**B. "Advertising Injury"**

We now turn to the parties' arguments about whether the Underlying Litigation makes claims against the insured potentially within the policies' coverage for "advertising injury." The Indiana Business Policies define advertising injury as follows:

> "Advertising injury" means the action of calling something to the attention of the public by means of printed or broadcast paid announcement for the sale of goods, products or services.
>
> "Advertising injury" means injury arising out of one or more of the following offenses:
>
> 1. Oral or written publication of advertising material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
>
> 2. Oral or written publication of advertising material that violates a person's right to privacy;
>
> 3. Misappropriation of advertising ideas or style of business;
>
> 4. Infringement of copyright, title or slogan as a result of your advertising.

(Dkt. No. 11-12, pp. 39, 55-56).

The problem here, according to the defendants, is that the Policies have two paragraphs with definitions of advertising injury. The parties agree that the claims in the Underlying Litigation do not fall within the second paragraph above (the one that lists four offenses from which an advertising injury must arise), but they do fall within the first paragraph (the one that describes media of advertising and its subject matter). Allstate argues that for coverage to exist, the requirements of both paragraphs must be met because advertising injury has two components. The

defendants argue that for coverage to exist, the requirements of only one of the paragraphs must be met. They contend that the absence of the word "and" between the two paragraphs makes Allstate's argument untenable or, at best, creates an ambiguity that must be construed against Allstate.

Neither party cites any case law where courts were faced with policy language regarding advertising injury in the same format as the Indiana Business Policies—that is, in a way in which the "advertising injury" is defined in two separate paragraphs.

Thus, the court turns to general principles of contract interpretation. As noted previously, insurance contracts are subject to the same rules of contract interpretation as other contracts, except there is a special rule *if* an ambiguity exists. In that case, the contract is construed against the insurer and the policy's language is viewed from the insured's perspective. *Bosecker v. Westfield Ins. Co.,* 724 N.E.2d 241, 244 (Ind. 2000). An ambiguity "does not exist simply because a controversy exists between the parties, each favoring an interpretation contrary to the other." *Linder v. Ticor Title Ins. Co.,* 647 N.E.2d 37, 39 (Ind. Ct. App. 1995). The court must determine whether reasonable persons can honestly differ as to the meaning. *Id.*

Here, a cardinal principle of contract interpretation convinces the court that "advertising injury" under the Policies necessarily includes both paragraphs and the lack of an "and" between them does not render the contract ambiguous. In interpreting insurance contracts, as well as any other contracts, the court should

"not . . . render any words, phrases, or terms ineffective or meaningless." *State Farm Mut. Auto. Ins. Co. v. D'Angelo,* 875 N.E.2d 789, 796 (Ind. Ct. App. 2007). The defendants' proposed interpretation does just that by eliminating the entire second paragraph and the very concept of injury. Both paragraphs are clear complements to one another, with the first paragraph capturing the type of action the insured must have engaged in (announcing through print or broadcast the sale of goods or services) and the second paragraph capturing the type of offense that the insured must have engaged in (slander, invasion of privacy, misappropriation of trade secrets, copyright infringement) that gives rise to the injury claimed by the alleged victim of the insured's action. The absence of an "and" between the two paragraphs would not cause a reasonable reader of the Policies to interpret the language in a way that wholly ignores and eliminates the concept of injury, which is clearly expressed by the second paragraph. It is illogical to write out of the contract the notion of injury and render its expression in the language of the contract ineffective.

Because the claims in the Underlying Litigation do not involve injury arising out of slander or libel, invasion of privacy, misappropriation of trade secrets, or copyright infringement (which none of the parties disputes), the court finds as a matter of law that no coverage is available based on assertion of "advertising injury."

## III.    Exclusions

Allstate's motion for summary judgment also addresses three exclusions in the Indiana Business Policies. It raises (1) the exclusion from advertising injury for

(a) injury arising from activities of any partnership or joint venture not shown in the Declarations and (b) injury arising out of an incorrect description of or mistake in advertised price of services; and (2) the exclusion from personal injury, accidental event, and advertising injury for injury arising out of the rendering or failure to render "scientific or professional services, or consulting business or technical services. . . ." *See* Allstate Brief in Support of Motion for Summary Judgment, Dkt. 35 at pp. 19-23; Reply Brief, Dkt. 43, at pp. 14-17. It is not necessary for the court to adjudicate the interpretation or applicability of these exclusions.

Exclusions operate to preclude coverage otherwise afforded by the indemnity provisions of the contract. *Keckler v. Meridian Sec. Ins. Co.,* 967 N.E.2d 18, 22 (Ind. Ct. App. 2012) (an exclusionary clause expresses a particular act, event, or omission that negates coverage); *PSI Energy, Inc. v. Home Ins. Co.,* 801 N.E.2d 705, 727 (Ind. Ct. App. 2004) (in insurance policy, "coverage language defines the set of all claims that are covered [and] exclusions define subsets of claims that, although within the main set, are nevertheless excluded"). They are akin to affirmative defenses: when coverage is found to exist under the general terms of the policy, the insurer may then demonstrate that an exclusion operates to eliminate that coverage. *Keckler,* 967 N.E.2d at 23 ("Generally, when an insurer wishes to rely upon an exclusionary clause in its policy, it is raising an affirmative defense to coverage and it bears the burden of proving its applicability."); *Walker v. Employers Ins. of Wausau,* 846 N.E.2d 1098, 1103 (Ind. Ct. App. 2006) (an exclusion is an affirmative defense to coverage).

Because we have already determined that the claims in the Underlying Litigation against the insureds are clearly outside the coverage afforded for an "accidental event" and "advertising injury"—the only two provisions under which the defendants argue coverage is possible—it is unnecessary to address the exclusions raised by Allstate.

## Conclusion

For the foregoing reasons, the court determines as a matter of law and declares that:

1. No coverage exists, and no duty to defend or to indemnify arises, as to any defendants under the Illinois Policies.

2. Defendants Preferred Financial Solutions, Inc. and Jeffrey Brooks are Persons Insured under the Indiana Business Policies.

3. Defendants Credit Card Relief, Inc. and Thomas P. Dakich d/b/a Dakich & Associates are not Persons Insured under the Indiana Business Policies.

4. Because the claims against Preferred Financial Solutions, Inc. and Jeffrey Brooks in the Underlying Litigation are patently outside the coverage under the Indiana Business Policies afforded for "personal injury," "accidental event," and "advertising injury," Allstate has no duty to defend or to indemnify Preferred Financial Solutions, Inc. or Jeffrey Brooks with respect to the claims in the Underlying Litigation.

Accordingly, the court GRANTS Allstate's motion for summary judgment (Dkt. 34) and DENIES the defendants' cross-motion for summary judgment (Dkt. 39).

So ORDERED.

Date: _03/24/2014_____

_Debra McVicker Lynch_
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email generated by the court's ECF system